UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v- | 18-CR-572 (JPO) |
| MINEL ARIAS, | OPINION AND ORDER |
| Defendant. | |

J. PAUL OETKEN, District Judge:

Defendant Minel Arias is charged in a one-count indictment with having violated 21

U.S.C. § 846 by participating in a conspiracy to distribute and possess with intent to distribute

controlled substances in violation of 21 U.S.C. § 841(b)(1)(B).  (Dkt. No. 13.)  Arias has moved

to suppress physical evidence and statements obtained by law enforcement in connection with a

stop and search of his vehicle on June 11, 2018.  (Dkt. No. 31.)  Arias argues that there was no

lawful basis sufficient to justify the initial stop, and that any statements he made or evidence

gathered by law enforcement during subsequent unconsented-to searches of his vehicle and

apartment must be suppressed as fruits of the initial unlawful stop.  (Dkt. Nos. 31–33, 36, 40.)

I.      Background

A.      The Challenged Search

The following facts are drawn from Arias's affidavit (Dkt. No. 33) and a Drug

Enforcement Administration ("DEA") incident report prepared by DEA Agent Venin

contemporaneously with Arias's June 11, 2018 arrest (Dkt. No. 36-1).  Each of these documents

was submitted by Arias in connection with the instant motion.

Arias was arrested in connection with the instant charged offense on June 11, 2018, at

approximately 3:30 a.m.  (Dkt. No. 33 ¶¶ 3,5; Dkt. No. 36-1 at 1.)  Just prior to his arrest, Arias

represents that he was lawfully parked on the side of a street located in Queens County, New

York.  (Dkt. No. 33 ¶ 4.)  Law enforcement officers effectuated a traffic stop of his vehicle at that time.  (Dkt. No. 36-1 ¶ 9.)  According to Arias, that stop was effectuated by DEA Agent McGrath, who approached Arias's vehicle and told him "don't move or I'll blow your head off." (Dkt. No. 33 ¶ 5.)  Arias was then removed from his vehicle and placed in handcuffs, and a number of other agents soon arrived on the scene.  (Dkt. No. 33 ¶¶ 5, 7.)

According to Arias, Agent McGrath told Arias at the time of the traffic stop that Arias's car was a stolen vehicle.  (Dkt. No. 33 ¶ 6.)  Agent Venin's report indicates, however, that approximately one hour before the traffic stop, law enforcement officers had submitted a query to the New York Department of Motor Vehicles regarding Arias's vehicle's license plates, and that query confirmed that the vehicle was registered to Arias's spouse.  (Dkt. No. 36-1 ¶ 4.) Arias asserts that McGrath ignored Arias's offers to provide documentation confirming that the car belonged to his spouse and was not stolen.  (Dkt. No. 33 ¶ 7.)

The DEA report summarizing the June 11, 2018 incident indicates that Arias consented to a search of his vehicle during the traffic stop. (Dkt. No. 36-1 ¶ 10.)  Arias denies having given his consent to such a search, and in fact represents that he objected to the search.  (Dkt. No. 33 ¶¶ 7–8, 10.)  The search of Arias's vehicle produced approximately 40 kilograms of suspected heroin.  (Dkt. No. 36-1 ¶ 11.)

The DEA incident report indicates that approximately thirty minutes later, after Arias was given his *Miranda* rights, Arias told law enforcement that the narcotics found inside his car belonged to him.  (Dkt. No. 36-1 ¶ 18.)  DEA agents then placed Arias under arrest.  (*Id.*)  Arias denies having made any such statement at the time of his arrest.  (Dkt. No. 33 ¶ 11.)

According to the DEA incident report, at the time of his arrest Arias also consented to a search of his residence in Queens County, New York.  (Dkt. No. 36-1 ¶ 18.)  Arias denies having

given this consent.  (Dkt. No. 33 ¶¶ 8, 10.)  The DEA incident report indicates that upon arriving at Arias's residence, DEA agents received consent from Arias's wife to search the apartment.  (Dkt. No. 36-1 ¶ 19.)  Through the course of their search of Arias's home, DEA agents found an additional approximately 3 kilograms of suspected heroin.  (Dkt. No. 36-1 ¶¶ 20–21.)

     **B.**     **DEA's Prior Investigations into Arias**

In opposing Arias's motion, the Government introduces evidence summarizing an approximately sixteen-month federal investigation into Arias's suspected narcotics activities that culminated in his June 2018 arrest.  (*See generally* Dkt. No. 37 at 3–14.)  The following facts are drawn from affidavits from law enforcement produced in support of wiretap applications with respect to Arias's cellphones (Dkt. Nos. 38-2–38-4), a "periodic report" issued by the Government in connection with one of those wiretap orders (Dkt. No. 38-5), Agent Venin's June, 11, 2018 incident report summarizing Arias's arrest (Dkt. No. 36-1, Dkt. No. 38-1), and the Complaint in this matter (Dkt. No. 1).  The Court details only those aspects of that investigation that are most relevant to its resolution of the instant motion.

The first of those affidavits, prepared by Agent Venin, describes a November 2017 conversation between Arias and one of his alleged co-conspirators in which Arias planned a narcotics transaction.  (Dkt. No. 38-2 at 15–18.)  Just prior to the relevant exchange involving Arias, that co-conspirator was instructed by yet another co-conspirator to call Arias to arrange the sale of a "mujer" or "woman" in exchange for "documents" or "pesos."  (Dkt. No. 38-2 at 14-15.)  According to Venin, and based on her training and experience, her knowledge of Arias's case, and the context of the relevant conversation, the phrases "mujer" or "woman" were used to refer to narcotics, and the words "documents" or "pesos" were used to refer to proceeds from the sale of narcotics.  (Dkt. No. 38-2 at 15.)  The co-conspirator was then given Arias's phone number and was told that that Arias was "one of our people" and "trustworthy."  (*Id.*)  In the

subsequent conversation between Arias and the alleged co-conspirator, which began approximately twenty minutes after the co-conspirator received Arias's phone number, Arias offered to travel from New York City to Boston to retrieve "some tickets" from the co-conspirator. (Dkt. No. 38-2 at 16–17.)  Agent Venin understood the word "tickets" to refer to the proceeds from the sale of narcotics.  (*Id.*)

Subsequent to these conversations, a warrant was issued authorizing the collection of location information for Arias's cellphone.  (Dkt. No. 38-2 at 18.)  Pursuant to this warrant, Venin learned that a user of Arias's cellphone travelled to and from New York City and Providence, Rhode Island by car twice in November and December 2017.  (Dkt. No. 38-2 at 18–19.)  Each time, the cellphone's user remained in Providence for approximately thirty minutes. (*Id.*)  Based on her training and experience, her knowledge of this case, and given the disparity between the time it took to travel to Providence and the time the user of the cellphone spent there, Venin believed that it was Arias who travelled to and from Providence and that he did so in order to retrieve proceeds from the sale of narcotics.  (*Id.*; *see also* Dkt. No. 38-3 at 19–20 (explaining that subsequent GPS tracking of Arias's vehicle and correlation between his cellphone and vehicle's locations indicated that Arias was most frequent driver of the vehicle).) In February 2018, Arias made a similarly brief trip from New York City to a truck stop in Kearny, New Jersey; although there was surveillance footage of Arias entering a restroom at the truck stop, Arias parked near a dumpster and as a result, DEA agents were unable to observe most of Arias's conduct at the scene.  (Dkt. No. 38-3 at 20.)  Venin represented that members of the narcotics operation in which Arias was suspected of participating "frequently" engaged in transactions at rest stops in the New York and New Jersey area.  (*Id.*)

Between the night of April 1, 2018 and the morning of April 2, 2018, GPS location data for Arias's vehicle revealed the following:  Arias left New York in the direction of New Jersey at 10:30 p.m.; he then spent approximately thirty minutes at a truck stop in Kearny, New Jersey, followed by one- and three-minute stops at two other locations in New Jersey; and he returned to Queens County, New York at approximately 12:59 a.m.  (Dkt. No. 1 ¶ 9.)  Another of Arias's co-conspirators, Aldo Mejia, was also present at one of those New Jersey stops around midnight, at the same time as was Arias.  (Dkt. No. 1 ¶ 10.)  Approximately six months earlier, law enforcement officers had conducted a search of Mejia's parents' property in California, where Mejia directed them to a tractor trailer in which there was upwards of $500,000 in cash packed in sixteen clear, duct-taped packages.  (Dkt. No. 1 ¶ 7.a.)  Mejia disclaimed ownership of this money (*id.*), but Mejia provided law enforcement with his phone number in connection with his efforts to cooperate (Dkt. No. 1 ¶ 10).  It was GPS location data obtained from Mejia's phone that confirmed that Mejia and Arias were present together at one of Arias's stops on the night of April 1, 2018 or morning April 2, 2018.  Toll records reviewed by law enforcement revealed that Arias was also corresponding with Mejia by cellphone throughout that night and morning, and that Mejia's phone number was the only one that Arias contacted during his trip to and from New Jersey.  (Dkt. No. 1 ¶ 11.)

Continued wiretaps of Arias's phone in April 2018 produced further correspondence in which Arias arranged to retrieve "tickets" from his alleged co-conspirators, and law enforcement officers understood these conversations to pertain to Arias's attempts to arrange further narcotics transactions.  (Dkt. No. 38-6 at 4–7.)

Finally, law enforcement officers used GPS location data to confirm that on June 9, 2018, two days before Arias's arrest, Mejia departed the vicinity of Los Angeles, California and headed

eastward toward New Jersey.  (Dkt. No. 1 ¶ 13.a.)  Law enforcement then established physical surveillance of I-78 in Pennsylvania and New Jersey on June 10, 2018 to track Mejia in conjunction with the GPS location data.  (Dkt. No. 1 ¶ 13.b.)  On June 11, 2018, at approximately 12:48 a.m., Arias departed his residence in Queens in the direction of New Jersey. (Dkt. No. 1 ¶ 13.c.)  GPS location data from approximately 1:48 a.m. that morning established Arias's location as somewhere in Carteret, New Jersey.  (Dkt. No. 1 ¶ 13.d.)  Law enforcement officers then spotted Arias's wife's car at a convenience store in Carteret, New Jersey at 2:37 a.m., and they attempted to physically surveil the car, but they were unsuccessful in maintaining that surveillance.  (Dkt. No. 1 ¶ 13.e.)  At 2:40 a.m., law enforcement reestablished physical surveillance of Arias's wife's car, which they successfully maintained through the time of the 3:30 a.m. stop of that vehicle in Queens that led to Arias's arrest.  (Dkt. No. 1 ¶ 13.f.)  During the time in which they were tracking Arias's vehicle on its way from New Jersey back to New York and thirty-five minutes prior to the stop and search of that vehicle in Queens, law enforcement officers conducted a separate traffic stop of a tractor trailer located in Carteret, New Jersey, in the vicinity of the convenience store where Arias's wife's vehicle had first been spotted.  (Dkt. No. 1 ¶ 13.g.)  Mejia was one of the persons found inside of that tractor trailer.  (*Id.*)

## II.   Discussion

Arias raises two distinct arguments in support of his motion to suppress: (1) that the initial stop of his vehicle was unlawful because it was not based on any reasonable suspicion (Dkt. No. 32 at 3–6); and (2) that the subsequent searches of his vehicle and home were not consented to and constitute fruit of the poisonous tree (Dkt. No. 32 at 6–8).  The Court addresses each argument in turn.

### A.     The Initial Stop

Arias argues that the initial stop of his vehicle on the side of the road on the morning of June 11, 2018 was unlawful because "it is clear that on that date, the agents had no reasonable suspicion to believe that Mr. Arias had committed a crime or a traffic violation."  (Dkt. No. 32 at 3.)  In response, the Government asserts that "the undisputed facts" gathered during law enforcement's months-long investigation into Arias "overwhelmingly demonstrate that law enforcement had reasonable suspicion to conduct a *Terry* stop of the defendant by ordering him out of [his spouse's vehicle]" on the morning of June 11, 2018.  (Dkt. No. 37 at 18.)

The parties do not dispute that law enforcement's initial seizure of Arias's parked vehicle should be analyzed under the rubric of a *Terry* stop.  (*Compare* Dkt. No. 33 at 3–4 *with* Dkt. No. 37 at 18.)  Such a stop of an automobile may be permissible under the Fourth Amendment if based on either probable cause or a reasonable suspicion that a crime or a traffic violation has occurred.  *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009); *see also United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) ("[Traffic] stops must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." (internal quotation marks omitted)).  The Supreme Court has explained that "investigative stops based on a reasonable suspicion of past criminal activity [can] withstand Fourth Amendment scrutiny," at least in the context of completed felonies.  *United States v. Hensley*, 469 U.S. 221, 227, 229 (1985).[1]

---

[1] In a reply affirmation, counsel for Arias contends that Agent Venin's "use of the phrase 'traffic stop'" in her incident report summarizing Arias's arrest misleadingly implies that Arias was pulled over for a moving violation.  (Dkt. No. 40 ¶¶ 7.)  In doing so, however, counsel for Arias (correctly) continues to concede that the stop of Arias's parked vehicle on the morning of June 11, 2018 would be legal if it could be justified on the basis of a reasonable suspicion that the occupant of the vehicle had engaged in criminal activity.  (Dkt. No. 40 ¶¶ 7–8.)  The Court thus proceeds to consider whether any such reasonable suspicion existed.

A reasonable suspicion sufficient to justify a seizure such as a traffic stop must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "Although the concept of reasonable suspicion is not susceptible to precise definition, the requisite level of suspicion to make an investigative stop is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Glover*, 957 F.2d 1004, 1010 (2d Cir. 1992) (internal quotation marks omitted). The reasonable suspicion inquiry is an objective one, and is not based "on the intentions or motivations of the particular detaining officers." *Id.*

As applied here, these principles dictate that "if [the DEA had] reasonable suspicion, grounded in specific and articulable facts, that [Arias] was involved in or [was] wanted in connection with a completed felony, then a *Terry* stop may [have] be made to investigate that suspicion." *Hensley,* 469 U.S. at 229. The Court concludes that the Government has identified facts sufficient to justify the initial stop of Arias's vehicle on the morning of June 11, 2018 under this standard.

Specifically, and to begin with, the Government has reproduced in affidavits numerous communications in which Arias attempted to arrange narcotics transactions in the months preceding his arrest. (Dkt. No. 38-2 at 16–17; Dkt. No. 38-6 at 4–7.) The Government also provides evidence of Arias's suspicious travels around the Northeast during this period. (Dkt. No. 38-2 at 18–19; Dkt. No. 1 ¶ 9.) These travels coincided not only with the communications described above, but also on at least one occasion with the arrival in New Jersey of Mejia, another individual believed by law enforcement to be engaged in narcotics trafficking on the basis of his having directed law enforcement to a cache of upwards of $500,000 cash hidden inside a vehicle parked at his parent's home. (Dkt. No. 1 ¶¶ 7–10.) In his reply affirmation,

Arias's counsel disputes the extent to which the Government can establish the suspicious nature

of each aspect of these various trips and conversations.  (Dkt. No. 40 ¶¶ 9, 11.)  It may be that

considering each of these various trips or correspondences one by one might lead to the

conclusion that the component parts of this "series of acts was 'perhaps innocent in itself,'  . . .

[but] taken together, [it is not unreasonable to conclude that] they 'warranted further

investigation.'"  *United States v. Arvizu*, 534 U.S. 266, 724 (2002) (quoting *Terry*, 392 U.S. at

22).

        Moreover, and perhaps most relevantly, law enforcement officers also tracked the

movements of Arias's vehicle as it left his home in Queens for New Jersey just hours before his

arrest, and in apparent coordination with the likely arrival time of his alleged co-conspirator

Mejia.  (Dkt. No. 1 ¶ 13.)  Again, this was the same Mejia who had not only led law enforcement

a few months earlier to a cache of over $500,000 in cash in duct-taped packages hidden in a

tractor trailer, but had now also been tracked by GPS location data and physical surveillance as

having departed California in the direction of New Jersey two days prior and in apparent

coordination with Arias's early morning June 11, 2018 departure from Queens.  (Dkt. No. 1

¶¶ 7.a., 13.a., 13.b.)  Arias spent no more than two hours in New Jersey; within two hours of his

initial departure, he was observed traveling back east toward Queens.  (Dkt. No. 1 ¶ 13.e.)  And

thirty-five minutes prior to the *Terry* stop of Arias's vehicle, law enforcement officers also

conducted a separate traffic stop of another vehicle in the New Jersey vicinity from which Arias

had departed, a tractor trailer in which Mejia was found.  (Dkt. No. 1 ¶ 13.g.)

        In his reply affirmation, Arias's counsel attempts to dispute the extent to which the

circumstances observed by law enforcement officers on the morning of June 11, 2018 were

sufficiently suspicious to justify their reasonable suspicion that the occupant of the vehicle

stopped in Queens had engaged in criminal activity.  (Dkt. No. 40 ¶ 10.)  Many, if not all, of Arias's counsel's purportedly fact-based contentions lack any evidentiary support and are directly contradicted by evidence submitted by the Government.  For example, Arias's counsel contends that the Government has failed to produce any evidence showing that Arias and Mejia were actually in New Jersey at the same time.  (*Id.*)  That is incorrect.  Arias's counsel's contention is belied by the sworn statement of Agent Venin representing that law enforcement had carefully tracked Mejia's travels from California to New Jersey by both GPS and physical surveillance in the days preceding his arrival (Dkt. No. 1 ¶¶ 13.a–13.b); that law enforcement had used GPS location data from Arias's cellphone to confirm that Arias traveled from Queens to New Jersey such that he would arrive in New Jersey at around the same time as would Mejia (Dkt. No. 1 ¶¶ 13.c–13.d); that law enforcement then observed Arias's wife's car in the same area, reasonably corroborating their suspicions that Arias was the likely occupant of his wife's car that evening (Dkt. No. 1 ¶¶ 13.e–13.f); and that law enforcement stopped Mejia in the same area of New Jersey from which Arias had departed thirty-five minutes before the stop of Arias's vehicle in Queens (Dkt. No. 1 ¶¶ 13.g–13.h).  Accordingly, and despite Arias's counsel's emphasis on the fact the he and Mejia were "*at no time observed near each other*" on the morning of June 11, 2018 (Dkt. No. 40 ¶ 10), Arias produces no evidence calling into question the Government's extensive evidence confirming the reasonableness law enforcement's suspicion that Arias and Mejia had in fact been together and engaged in unlawful activity earlier that morning.

In short, the circumstances preceding the June 18, 2018 *Terry* stop of Arias's vehicle are properly considered in unison in assessing the reasonableness of that stop, and "[t]aken together, . . . they sufficed to form a particularized and objective basis for [the] stopping [of

Arias's] vehicle, making the stop reasonable within the meaning of the Fourth Amendment."
*Arvizu*, 534 U.S. at 277–78.

### B.  Subsequent Searches

Arias contends that the searches of his vehicle and apartment subsequent to the *Terry* stop
violated the Fourth Amendment because they were not consented to.[2] (Dkt. No. 32 at 6; *see also*
Dkt. No. 33 ¶ 10.)  The Government disputes this, citing representations from the DEA agents at
the scene of his arrest who allegedly received Arias's consent to search his vehicle and
apartment.  (Dkt. No. 37 at 21, 24; *see also* Dkt. No. 38-1 ¶¶ 10, 18.)

The Fourth Amendment allows for "consensual searches[,] because it is no doubt
reasonable for the police to conduct a search once they have been permitted to do so."  *Florida v.
Jimeno*, 500 U.S. 248, 250–51 (1991).  For consent to search to be legally effective, the
Government must prove that any consent given was "a product of that individual's free and
unconstrained choice, rather than a mere acquiescence in a show of authority."  *United States v.
Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (quoting *United States v. Wilson*, 11 F.3d 346, 351 (2d
Cir. 1993).  "The government has the burden of proving, by a preponderance of the evidence,
that a consent to search was voluntary."  *United States v. Isiofa*, 370 F.3d 226, 230 (2d Cir.
2004).

According to the Government, however, the Court need not resolve the disputed fact
question of whether Arias provided voluntary consent to law enforcement to conduct the two

---

[2] Arias also contends that any evidence gathered during the search of his automobile and
home, as well as any statements he made during this period, are independently subject to
suppression because they are tainted by the earlier unlawful *Terry* stop.  (Dkt. No. 32 at 6.)  But
because the Court has concluded that the *Terry* stop of Arias's vehicle was lawful under the
Fourth Amendment, the Court need not consider Arias's fruit-of-the-poisonous-tree contentions
further.

searches at issue.  The Government cites two distinct legal theories in support of this contention,

arguing that that these theories independently justify each of the searches at issue, irrespective

whether those searches were conducted with Arias's consent.  These theories are: (1) the

automobile exception to the warrant requirement (Dkt. No. 37 at 22–23); and (2) the rule from

*Fernandez v. California*, 571 U.S. 292 (2014), allowing that the consent of one of a home's

present occupants justifies a search of that home, so long as there are no objecting co-occupants

also present at the time of the search (Dkt. No. 37 at 23–24).  The Court addresses each of these

two theories in turn.

### 1.    Automobile Search

The Government contends that the search of Arias's car following the *Terry* stop of his

vehicle was justified by probable cause, and thus was permissible under the automobile

exception to the warrant requirement.  (Dkt. No. 27 at 21–23.)

Under the automobile exception, "officers may conduct a warrantless search of a vehicle

if they have probable cause to believe it contains contraband or other evidence of a crime."

*United States v. Wilson*, 699 F.3d 235, 245 (2d Cir. 2012).  Moreover, "[i]f probable cause

justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the

vehicle and its contents that may conceal the object of the search." *California v. Acevedo*, 500

U.S. 565, 570 (1991) (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)).

"A police officer has probable cause to conduct a search when the facts available to him

would warrant a person of reasonable caution in the belief that contraband or evidence of a crime

is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (internal quotation marks and

alterations omitted).  The probable cause inquiry cannot be "reduc[ed] to 'precise definition or

quantification,'" *id.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)), but instead

requires only that there be a "'fair probability' on which 'reasonable and prudent [people,] not

legal technicians, act,'" *id.* at 244 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 231 (1983)).

The Court concludes that the same evidence recounted above that was sufficient to justify

the *Terry* stop of Arias's spouse's vehicle also provided law enforcement with probable cause to

search the contents of that car for contraband.  Some of the evidence most relevant to this

conclusion includes: Arias's conversations that had been captured by wiretap in the weeks and

months preceding the June 2018 search of his automobile in which he appeared to be arranging

drug transactions (Dkt. No. 38-2 at 16–19; Dkt. No. 38-6 at 4–7); GPS location data confirming

that Arias also engaged in a number of suspicious trips around the northeast that law

enforcement officers considered indicative of drug trafficking, coinciding both with the

wiretapped conversations described above and the travels of one of Arias's alleged co-

conspirators, who had previously directed law enforcement to a cache of money that they

believed constituted narcotics trafficking proceeds (Dkt. No. 38-2 at 18–19; Dkt. No. 38-3 at 20;

Dkt. No. 1 ¶¶ 7–12); and Arias's movements in the hours immediately preceding the search of

Arias's spouse's car, during which time law enforcement officers tracking Arias via both

physical surveillance and GPS again observed him engage in a suspiciously timed trip from New

York to New Jersey, yet again made in apparent coordination with Arias's alleged co-conspirator

who had recently departed California, the location where the cash cache had been found.  (Dkt.

No. 1 ¶ 13.)  "[G]iven all the circumstances set forth in the affidavit[s]" before the Court, the

Court concludes that a reasonable and prudent person in law enforcement's position on the

morning of June 11, 2018 would have believed there to be "a fair probability that contraband or

evidence of a crime" would be found inside Arias's spouse's car.  *Gates*, 462 U.S. at 238.  On

this basis, the Court concludes that there was probable cause to search Arias's spouse's vehicle at

that time, and that the search of that vehicle was valid under the automobile exception to the

warrant requirement.[3]

### 2.    Apartment Search

"[P]olice officers may search jointly occupied premises if [only] one of the occupants

consents." *Fernandez*, 571 U.S. at 294.  However, this rule does not apply when a co-occupant

"objector is standing in the door saying 'stay out' when officers propose to make a consent

search." *Id.* at 306.  This is because "a physically present inhabitant's express refusal of consent

to a police search [of a home] is dispositive as to him, regardless of the consent of a fellow

occupant." *Georgia v. Randolph*, 547 U.S. 103, 122–23 (2006).

In *Fernandez v. California*, 571 U.S. 292 (2014), the Supreme Court made clear that the

objecting occupant's absence from the scene of the search obviated the applicability of the

*Randolph* rule, *id.* at 302.  The *Fernandez* Court explained that "[t]he *Randolph* holding

unequivocally requires the *presence* of the objecting occupant in every situation other than"

those in which the searching officers removed the objecting tenant for the sake of avoiding his

objections.  *Id.* at 302–03 (emphasis added).  The *Fernandez* Court further clarified that the

arrest of the objecting occupant does not constitute an impermissible removal sufficient to render

ineffective a remaining co-occupant's consent to a search of the arrestee's home.  *Id.*

---

[3] Attempting to rebut the Government's assertion of probable cause, Arias's reply affirmation emphasizes the Government's failure to point to evidence showing that law enforcement had physically observed Arias and Mejia together on the morning of June 11, 2018. (Dkt. No. 40 ¶¶ 19–23.)  Again, these contentions fail to rebut the Government's extensive evidence showing that law enforcement knew that Arias and Mejia had both spent the same brief window of time in the same local vicinity of New Jersey just prior to their search of Arias's car. (*See* Dkt. No. 1 ¶ 13.)  For reasons already addressed, this undisputed evidence allows the Court to conclude that a reasonable and prudent person in law enforcement's position on the morning of June 11, 2018 would have believed there to be "a fair probability that contraband or evidence of a crime" would be found inside Arias's spouse's car.  *Gates*, 462 U.S. at 238.

Here, the Government has produced unrebutted evidence that Arias's spouse consented to the search of her and Arias's apartment.  (Dkt. No. 38-1 ¶ 19.)  Whether or not Arias had or had not previously consented to that search (*compare* Dkt. No. 33 ¶ 10 *with* Dkt. No. 38-1 ¶ 18), Arias's wife's consent was itself sufficient to permit law enforcement to conduct the apartment search.  Moreover, the fact that Arias was himself unable to presently object because law enforcement had arrested him does nothing to alter this conclusion, as "an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason."  *Fernandez*, 571 U.S. at 303.  Accordingly, and on the basis of the Government's unrebutted evidence that Arias's spouse consented to the search of her and Arias's apartment following Arias's arrest, the Court concludes that the search of Arias's apartment was conducted pursuant to valid consent and did not run afoul of the Fourth Amendment.

## III.    Conclusion

For the foregoing reasons, Arias's motion to suppress is DENIED.

The Clerk of Court is directed to close the motions at Docket Numbers 31, 36, and 39.

SO ORDERED.

Dated:  March 20, 2019
        New York, New York

_____
                 J. PAUL OETKEN
              United States District Judge